# THE SCOTLAND.

## DYER & Others *v.* NATIONAL STEAM NAVIGATION COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

Argued March 12, 13, 1885.—Reargued October 20, 21, 1885,—Decided May 10, 1886.

The decision in the previous case of *The City of Norwich*, repeated on the question relating to the time when the value of ship and freight is to be taken for fixing the liability of the owner, and on the question of insurance.

Where a collision occurred by which the offending ship and her cargo were sunk at sea, but strippings from the ship were rescued before she went down, from which the owners afterwards realized several thousand dollars: *Held*, that in awarding damages against the owners, limited to the amount of their interest in the ship, the court is not bound to allow interest on the proceeds of the wreck or strippings; but may, in its discretion, allow interest or not.

The Circuit Court is not bound to allow interest on costs awarded by the District Court, although such costs are included in the decree of the Circuit Court.

The allowance of interest by way of damages in cases of collision and other cases of pure damage, as well as the allowance of costs, is in the discretion of the court.

The following is the case as stated by the court:

This case presents nearly the same questions which have just been considered in the case of *The City of Norwich*. It was before this court in October Term, 1881, and was decided in March, 1882. See *The Scotland*, 105 U. S. 24. From the report of the case, but not from the record now before us, we learn that the ship Kate Dyer and the steamship Scotland (the latter belonging to the appellee) came into collision in December, 1866, opposite Fire Island Light, and the former immediately sank and was lost. The Scotland, being badly injured, put back for New York, but sank outside and south of Sandy Hook, only some strippings being rescued from her before she

went down. The owners of the Kate Dyer and others who had suffered loss filed libels *in personam* against the National Steam Navigation Company, respondent and now appellee, who filed an answer denying that the Scotland was in fault, and pleading that she was sunk and destroyed, and, therefore, that there was no liability against the respondent. The Circuit Court, on appeal from the District Court, found the Scotland in fault, and rendered a decree in favor of the libellants for the full amount of their damage, amounting with interest to upwards of $250,000, besides the costs of the libellants in the District Court, amounting to $2173.10.

This decree was reversed by this court in March, 1882, so far as it condemned the respondent to pay the whole amount of damages sustained by the libellants and intervenors, and affirmed as to the residue, the court, in its opinion, holding that the amount of the respondent's liability was the value of the ship's strippings which were saved from the wreck.

The case went back to the Circuit Court, but was not further prosecuted until June, 1883, when the libellants applied for leave to file a supplemental allegation to their libel, for the purpose of showing that the respondent had received a large amount of insurance for the loss of the Scotland, which the libellants claimed should be included in the amount of the respondent's liability. The amendment was allowed without prejudice to the respondent, and with a reservation of the question as to the legality of such an amendment after the decree of this court had been rendered and a mandate sent down. The case was then referred to ascertain the amount realized from the strippings, and from the insurance of the Scotland. The finding of facts in the court below, based on the report of the commissioner, on evidence and on admissions of the parties, states that the amount realized from the strippings was $4927.-85, received on or before the 27th of July, 1868; that the freight for the voyage was $13,703.20, but no part of it was earned or received; that the passage money was $1703.65, but was all absorbed in refunding part, and employing the residue in transferring and reshipping the passengers; that the value of the Scotland before the collision was £100,000; and that

the insurance effected on her and received by the respondent was £61,647, equal to $299,867.42. As conclusions of law, the court held that the proper amount to be paid by the respondent, as depending upon the value of the articles saved, was $4927.85; and that the insurance received by the respondent formed no part of its interest in the steamship to be surrendered in limitation of its liability under the statute. A decree was thereupon made that the respondent pay into the registry of the court the sum of $4927.85 as the value of the strippings and remnants of the Scotland; and the sum of $2173.10, the costs of the libellants in the District Court, and the costs in the Circuit Court; and that upon such payment the respondent should be discharged from all liability to the libellants and intervenors.

To the findings of fact and conclusions of law of the Circuit Court the libellants excepted on the following grounds, to wit:

1. That interest should have been allowed on the sum of $4927.85:

2. That all freight and passage money should have been added:

3. That the amount of insurance received should have been added:

4. That the libellants should have had a decree for their entire loss.

On the argument it was also claimed that interest should have been allowed on the costs of the District Court ($2173.10).

The case was first argued at October Term, 1884. On the 6th day of April, 1885, the court ordered a reargument, which was had at the present term by the same counsel who argued at the last term.

_Mr. E. N. Taft_ for appellant Rollins, referring to the briefs in the other cases, cited _The Rebecca_, 1 Wall. 187; _Norwich Co._ v. _Wright_, 13 Wall. 104; _Brown_ v. _Wilkinson_, 15 M. & W. 396; _Wattson_ v. _Marks_, 2 Am. Law Reg. 167; _Coggs_ v. _Bernard_, 2 Ld. Raym, 909, 917; _Phil. and Read. Railroad Co._ v. _Derby_, 14 How. 468; _Railroad Co._ v. _Lockwood_, 17 Wall. 357,

and cases there cited; *Bank of Kentucky* v. *Adams Express Co.*
93 U. S. 174; *Rice* v. *Railroad Co.* 1 Black 358; *The North
Star*, 106 U. S. 17; *Williams* v. *Fitzhugh*, 37 N. Y. 444; *Dyer*
v. *National Steam Navigation Co.* 14 Blatchford, 487; *Andrews*
v. *Durant*, 18 N. Y, 483; *Parrott* v. *Knickerbocker Ice Co.* 46
N. Y. 361; *Schwerin* v. *McKee*, 51 N. Y. 180; *Goddard* v. *Fos-
ter*, 17 Wall. 123; *McCallum* v. *Seward*, 62 N. Y. 316; *The
Mary Eveline*, 14 Blatchford 497; *African Steamboat Co.* v.
*Swanzy*, 1 K. & J. 326; *Gen. Iron Screw Collier* v. *Schuemans*,
29 L. J. Ch. 877; *Nixon* v. *Roberts*, 30 L. J. Ch. 844; *Straker*
v. *Hartland*, 34 L. J. Ch. 122; *Smith* v. *Kirby*, L. R. 1 Q. B.
D. 131; *The Sisters*, 2 Aspinall's Maritime cases, N. S. 588;
*The Northumbria*, L. R. 3 Ad. & Eccl. 6; *Thomessen* v. *Whit-
well*, 21 Blatchford 45, 62; *Columbian Ins. Co.* v. *Ashby*, 13
Pet. 331; *Prov. & N. Y. Steamship Co.* v. *Hill Mfg. Co.* 109
U. S. 578; *The Rajah*, L. R. 3 Ad. & Eccl. 539; Lieber's Her-
meneutics, 3d ed. 136; Prussian Code, Introduction, p. 54,
quoted in Lieber's Hermeneutics, page 120; *Insurance Co.* v.
*Durham*, 11 Wall. 1; *The Dolphin*, 1 Flippin, 580; Émerigon
Contrats, ch. 3; § 9.

*Mr. James C. Carter* for appellants.

The question, shortly stated, is: What is included under the
words " amount or value of the interest of such owner in such
vessel and her freight then pending," contained in § 4283 of the
Revised Statutes? In the determination of this question much
depends upon the principles of interpretation which are to be
applied in ascertaining the real intent of the legislature.

If this question be viewed in the light only in which the suf-
ficiency of a declaration, or the terms of a written conveyance
*inter partes* are considered, the conclusion might easily be
reached that, as an assignment or transfer of the subject of in-
surance does not ordinarily carry the insurance with it as an
incident, the two things are independent and distinct; and,
consequently, that insurance cannot in this statute be embraced
under the terms " amount or value of the interest of such owner
in such vessel."

If, upon the other hand, we view the enactment in question

as one effecting changes in the law governing the responsibility of public carriers—a most important branch of the public policy of States—reasons very speedily appear which lead to the conclusion that Congress must have designed that the ordinary insurance by a shipowner against a sea peril should be regarded as incidental to, and, therefore, a part of the subject insured.

The interpretation of the statute cannot properly be removed from the control of those considerations of public policy from which it springs.

It is first to be observed that the principal field of the operation of this act is the relations between carriers and shippers of goods. By general law a most rigorous liability is imposed upon public carriers for the safety of goods and passengers. This responsibility is so severe that, as to goods, they are declared to stand in the place of insurers ; and as to passengers, they are held to be bound to the exercise of the highest degree of diligence. These rigorous obligations are imposed, not because they are dictated by natural justice, but in accordance with the supposed necessities of a sound public policy. In the view of that policy, the requisite measure of diligence can be secured only by that ever present sense of its necessity which is produced by the imposition of this severe obligation. *Railroad Co.* v. *Lockwood,* 17 Wall. 357, 377, *et seq.*

Again, the public carrier is subjected to this rigid liability, not only in respect to his own acts, but also in respect to the acts of his agents and servants ; and this rule has been adopted, not in obedience to any principle of natural justice, but as the dictate of a sound view of public policy. *Railroad Co.* v. *Lockwood,* above cited.

There has been from time immemorial in many continental nations, and more recently by express statute in this country (the act in question), a relaxation of this severe obligation in respect to carriers by water; and such relaxation, like the rule itself, springs from the teachings of public policy, being an indulgence designed to encourage the building and employment of ships. *Norwich Co.* v. *Wright,* 13 Wall. 104, 121.

Whether this statutory relaxation was applicable in the

Courts of the United States to controversies in which foreign vessels were parties was an open question until its decision by this court in this case, and such decision as to the intent of Congress was avowedly placed by this tribunal upon like considerations of public policy. *The Scotland*, 105 U. S. 24, 33.

So, also, serious question has been made as to whether, in ascertaining the value of an owner's interest, for the purpose of determining the extent of his liability, the value is to be taken before or after the casualty. Either construction of the statute is admissible; but, reasoning from grounds of public policy, and imputing to Congress the intent to act in accordance therewith, it has been determined that the value to be ascertained is the value of the interest *after* the happening of the casualty. *Norwich Co.* v. *Wright*, above cited.

Applying the same methods to the determination of the question now brought before the court, there can be little doubt that the true construction of the language "the amount or value of the interest of such owner," should embrace any insurance upon such interest.

Clearly there is nothing in this language which *excludes* such interpretation. In common understanding a policy of insurance is *incidental* to the subject insured, and it is entirely consistent with propriety of speech to say that there are two kinds of interest in ships : one, an *insured* interest; and the other, an *uninsured* interest.

In all ordinary dealings the insurance is treated as simply incidental to the subject insured. Whenever there is a sale of the subject, be it ship or cargo, the insurance is transferred with the subject to the purchaser. Such transfer may or may not require the performance of a separate act of assignment. In one class of cases, namely, those in which the insurance is for the benefit of whoever may be interested at the time of the loss, the insurance is, by its terms, incidental to the subject insured and passes with it; but in other cases, in which no such language is employed, the insurance, as a general rule, is, in fact, regarded none the less as incidental to the subject. The mere circumstance that an additional act is requisite, in order to effect a transfer of the interest in case of a sale, is quite im-

material. Phillips on Insurance, § 76; 2 Duer on Insurance, § 35.

There are two considerations which ought to be conclusive on the present position. (1) By the general law a public carrier cannot by special contract relieve himself from the obligation of exercising diligence, nor can he, it is assumed, directly protect himself by insurance against any loss or damage which he may sustain by reason of being obliged to pay damages to others for the consequences of his want of diligence. But, unless in cases like the present, the amount of an insurance upon the offending vessel is, in case of loss, to be made subject to the claims of those who have suffered damage from such offending vessel, the plain consequence is that the owner of the guilty ship is enabled by the mere fact of an insurance upon his interest to achieve two things: *first*, full indemnity to himself for the loss of his own property; *second*, complete exemption from liability for the consequences of his own culpable negligence. Can Congress be supposed to have intended the introduction of any such incongruity into the law governing the obligation of carriers? (2) If the owner of the guilty vessel is entitled in case of the loss of such vessel by a peril *subsequent* to the casualty, and before the termination of the voyage, to take to himself the proceeds of an insurance on his interest, then this further striking incongruity is brought about. One ship, through culpable negligence, sinks another, and the owners of the former become liable to pay therefor $100,000. The offending ship remains intact and prosecutes her voyage. If such voyage is completed in safety, the ship must be yielded up to satisfy the demands of her victim. If she is lost, those demands are absolutely extinguished by that mere fact, and the proceeds of the insurance are gathered by the owners of the guilty vessel. What situation does the master of the guilty vessel occupy in such a case, after the casualty and before the loss? By the sacrifice of his vessel he may earn $100,000 for his owners. If he performs his duty, it is only to the detriment of his owners and to the advantage of strangers. Did Congress design any such anomaly as this?

The only obstacles in the way of the interpretation on which we insist arise from the circumstance that a policy, not issued for the benefit of whom it may concern at the time of the. loss, is not assignable with the subject of insurance. But it is the opinion of the best authorities that whenever by any policy of insurance, it is the *contemplation* of the parties, however manifested, that the insurance should pass with a transfer of the subject, it will pass upon such transfer. Is it too much to say that whenever any insurance is effected, the result of which may be to call upon underwriters to indemnify the owner for the loss of a ship which has charged herself with a lien for damages to others occasioned by negligence, there will *be imputed* to the parties an intention that the proceeds of the policy should go to indemnify the sufferers, and not to those who inflicted the damage? See Phillips on Insurance, §§ 89, 104.

It is well established that where the owner of an insured interest sells it, assuming to stand as trustee of it for the benefit of the purchaser, he will hold a policy of insurance on the subject as such trustee. Why, in this case, do not the owners stand, under the law, as trustees for the benefit of those who have sustained the loss ?

The doctrine we contend for is in harmony with every principle of equity, and preserves the integrity of those rules, heretofore deemed so essential to the maintenance of care and diligence on the part of public carriers. The contrary doctrine tends directly to diminish the force of the motives to diligence, and is inconsistent with the fundamental rules governing the liability of carriers.

*Mr. C. R. Ingersoll*, counsel for appellants Wright and Others in *The City of Norwich, ante* 468, by leave of court filed a brief on behalf of appellants in this case, presenting substantially the views of the law argued by him in that case.

*Mr. Harrington Putnam* and *Mr. James K. Hill* on behalf of Jens Thommessen & Another, appellants in *The Great Western, post* 520, by leave of court filed a brief in this case, in which they cited the following continental authorities :

*French Authorities:* Laurin, note to 1 Cresp, Cours de Droit Maritime, Paris (1876–1878), page 182, citing Émerigon, Contrats à la grosse, ch. xii. § 7, t. II. p. 585 *et seq.;* 1 Valin, Com. sur l'ord. de la Marine, 316 (art. 3, tit. XII.), citing a decision of the Parliament of Bordeaux, Sept. 7, 1758; Émerigon, Contrats à la grosse (as above cited), Hall's Translation, Baltimore, 1811, pp. 255, 256; Pardessus, Cours de Droit Commercial, 1st ed. n. 663; ib. 2d ed. part IV. tit. 11, ch. III. § 2; ib. part III., tit. 1, ch. 1; Boulay-Paty, Cours de Droit Com. Mar.; Labraque-Bordenave, Traité des Assurances en France et à l'Etranger, Paris, 1876; Gonse, Effets de l'Abandon du Navire, 9–10 (Paris, 1872); De Courcy, Questions de Droit Maritimes, 2me série, 195 (Paris, 1879); le Comte de Portalis, in the Cour de Cassation, 1841; Camille Périer, le Comte Portalis, le Comte Marburg, and Persil in debate in the Chambre des Pairs in 1841, Moniteur, April, 1841; 8 Revue Étrangère et Française de Liq. 540; Dufour, Droit Maritime, 372–398; Code Civil, Art. 2095; 1 Couder, Dict. du Droit Com. 418; Boistel, Précis de Droit Com. 885 (2d ed. Paris, 1878).

*German Authorities:* Das Allgemeine Landrecht of Prussia; Behrend, in Holtzendorff, 1 Encycl. der Rechtswissenschaft, 336 *et seq.;* Kaltenborn, 1 Grundsätze des praktischen Europäischen Seerechts 31 (Berlin, 1851); Pöhls, 3 Darstellung des gemeinen Deutschen und des Hamburgischen Handelsrechts, 234; Weiske, 9 Rechtslexikon 744; Wendt on Maritime Legislation, London, p. xxvii; Makower, Das Allgemeine Deutsche Handelsgesetzbuch, XVII.; Protokolle der Kommission zur Berathung eines allgemeinen Deutschen Handelsgesetzbuches von J. Lutz, Beilagenband, p. 345; Commission to amend the Maritime Laws of Germany, 4 Protokolle, 1606; 8 Protokolle 4169, 4171.

These authorities (they contended) lead to the following conclusions:

1. The equity to insurance was deduced by the French courts from a statute prescribing an *abandon* only of ship and freight.

2. It has been maintained by Valin and Pardessus and was

earnestly advocated by the highest French judicial authority, viz., the Cour de Cassation.

3. The equity to insurance was denied by the Chamber of Peers in 1841, in opposition to the wish of the highest court, on grounds that were professedly temporary and local.

4. Although French jurisprudence on this point may be unsettled, evidencing a transitional stage in its development, the latest expression of the legislative will is in the direction of restoring the insurance equities to all creditors who have a specific lien on the vessel.

5. That the express enforcement of this equity by Prussian legislation for over fifty years was completely satisfactory to both shipowner and creditor; and that the first attempt of Prussian jurists to change the law in imitation of the supposed policy of France, was met with unanimous remonstrance from the shipping interest represented at the Berlin conference.

6. That the ultimate reversal of the law was against the protest of Prussia, and was accomplished by votes of nations, many of whom had much less at stake in maritime affairs, and at a period when the example of supposed French legislation was much more influential than now.

7. That a principle authoritatively announced by Valin, supported by Pardessus, practically enforced by the French courts, urgently advocated by the Supreme judicial authority of France, administered successfully for over half a century in the great Prussian ports of the Baltic, and sanctioned by the chief legal authority of Berlin, is in fact a veritable equity in maritime law, and worthy the adoption of this tribunal.

On The Nature of Insurance, *Mr. Putnam* and *Mr. Hill*, further cited: French Code Civil, § 1964; Holtzendorff's Rechtslexikon, 1080; 1 Dufour Droit Maritime, 373; Hallager Den Norske Söret, 114 (Christiania, 1873); Émerigon Traité des Assurances et des Contrats à la grosse, t. 2, 221 (Marseilles, 1783); French Law of May 28, 1858; Statute Geo. III. ch. 78; French Code du Commerce, § 191, subd. 10; Belgium, Art. 23, Law of June 11, 1874; Italy Com. Code, 1883, Art. 677, subd. 8; Spain, Com. Code, § 598; Portugal, Com. Code, §§ 1300, 1307; 9 Weiske Rechtslexikon, 741; *The Dolphin*, 1

Flippin, 580; *The Illinois*, 2 Flippin, 383; Persil, Traité des Assurances, 118; 2 Lewis, Das Deutsche Seerecht, 189; 3 Cresp-Laurin, Cours de Droit Marit. 446; 1 de Couder, Dict. de Droit. Com. 418; Cour de Cassation, 12. Aug. 1872, 1 Sisey, 1872, 323; *The Potomac*, 105 U. S. 630; *Wood* v. *Lincoln Ins. Co.*, 6 Mass. 479; *Commonwealth Ins. Co.* v. *Chase*, 20 Pick. 142; *Reynolds* v. *Ocean Ins. Co.* 22 Pick. 191; and they deduced from an examination of these authorities the following principles: That insurance moneys are a representative of some subject of property. To say otherwise would be a return to the wager theory. To say they represent the physical object insured may be open to objection. To affirm, however, that the proceeds of the insurance represent merely the premium is unsound and untrue—unsound, because it falls back on the discarded wager doctrine, and untrue, because in reality payment of premium alone, without right or title, gives no claim to the insurance moneys.

Unless the insurance contract is a mere wager, its proceeds must represent the subject matter to be indemnified. But this subject matter is not the physical object destroyed. It is the proprietary ownership, the right or title of the insured, that insurance makes good and represents. In a word the insurance money restores, represents, and replaces the insured's interest in the object sustaining the injury.

It is to be noted that the language of the act of 1851 is exceedingly broad. It does not call for the abandonment or disclaimer of ownership of the French law. It requires a transfer of interest, the exact word of Pardessus, importing a complete cession, leaving no rights in the original owner. This word "interest" was a law term as early as the 12th century. Littré, "*Intérêt;*" Grimm, "*Interesse;*" Skeat, "*Interest.*" To transfer one's interest in a thing is to confer upon the assignee every right or incident of a right in it.

*Mr. Jeremiah Halsey* and *Mr. J. W. C. Leveridge*, counsel for the owners of the City of Norwich, by leave of court filed a brief on the question of the limitation of the liability of shipowners under the statutes of the United States and under the

general maritime law, which substantially presented Mr. Halsey's views in the *City of Norwich, ante* 468.

*Mr. John Chetwood* for appellee 'cited *The Santa Maria,* 10 Wheat. 431; *Sibbald* v. *United States,* 12 Pet. 488, 492; *Washington Bridge Co.* v. *Stewart,* 3 How. 413, 424; Burrill's Law Dict., Bouvier's Law Dict., Brown's Law Dict., word *Interest; City of Norwich,* 3 Ben. 575; *Thommessen* v. *Whitwill,* 21 Blatchford, 45; *Denn* v. *Reid,* 10 Pet. 524; *Pacific Ins. Co.* v. *Catlett,* 4 Wend. 75; *Yates* v. *Whyte,* 4 Bing. N. C. 272; *Lynch* v. *Dalzell,* 3 Bro. P. C. 431; *Sadlers Co.* v. *Badcock,* 2 Atk. 554; *Carpenter* v. *Providence Washington Ins. Co.* 16 Pet. 495; *Columbian Ins. Co.* v. *Lawrence,* 10 Pet. 507; Valin; Pardessus; *The North Star,* 106 U. S. 17; *Wattson* v. *Marks,* 2 Am. Law Reg. 157; *The Peshtigo,* 2 Flippin, 466; *The Benefactor,* 103 U. S. 245; *The Scotland,* 105 U. S. 24; *Ex parte Slayton,* 105 U. S. 450; *Prov. & N. Y. Steamship Co.* v. *Hill Mfg. Co.,* 109 U. S. 578; *Howland* v. *Lavinia,* Pet. Adm. 123; *Griggs* v. *Austin,* 3 Pick. 20; *Mulloy* v. *Backer,* 5 East, 316; *Moffat* v. *East India Co.,* 10 East, 468; *Watson* v. *Duykinck,* 3 Johns. 335; *Lewis* v. *Marshall,* 7 Man. & Gr. 729; *Gillan* v. *Simpkin,* 4 Campbell, 241. And on the question of interest, *Hemmenway* v. *Fisher,* 20 How. 255, 260; *Redfield* v. *Iron Co.,* 110 U. S. 174; *Boyce* v. *Grundy,* 9 Pet. 275.

Mr. JUSTICE BRADLEY, after stating the case as reported above, delivered the opinion of the court.

These points are all disposed of in the previous case of *The City of Norwich,* except the question of interest. Were the libellants entitled to interest on the amount received from the strippings? In answering this question it must be borne in mind that this is not a question of debt, but of damages. The limitation of those damages to the value of the ship does not make them cease to be damages. The allowance of interest on damages is not an absolute right. Whether it ought or ought not to be allowed depends upon the circumstances of each case, and rests very much in the

discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury. The record now laid before us contains no part of the pleadings or proceedings in the cause prior to the first decree of the Circuit Court. We are without any means of knowing the circumstances in the pleadings or the evidence upon which the court was called upon to act, except the bare facts stated in the finding of facts before referred to. The right to a limitation of liability seems to have been denied to the respondent from the beginning. If it offered to pay the value of the strippings into court in its discharge from liability, or desired to do. so, it is evident that the court would not allow it to do so, and that the libellants resisted it with all their power. The respondent was obliged to wait till the decision of this court in March, 1882, before getting a declaration of its rights in the matter; and the first move afterwards made was the attempt of the libellants to change the whole form of the controversy by setting up the new claim to the insurance money received by the respondent. Without stopping to decide whether this amendment of the proceedings was lawfully allowed after the decision of this court, it is sufficient to say that the Circuit Court, so far as we have anything before us to show to the contrary, may have had very good reasons for not allowing interest on the value of the strippings. We are not disposed to disturb its decree in this respect.

The question relating to interest on the costs requires but brief examination. Costs in admiralty, as well as in equity, are in the discretion of the court. Benedict's Adm. § 549. Appeals in matter of costs only are not usually entertained; but when the entire case is before the appellate court, it has control of the subject of costs, as well as of the merits. *Trustees* v. *Greenough*, 105 U. S. 527; 2 Conk. Adm. Pr. 373. In the present case, the Circuit Court by its original decree, made in 1878, adjudged to the libellants their costs in the District Court, amounting to $2173.10. In March, 1882, we affirmed this part of the decree, but without interest. In affirming a decree in admiralty in this court, if interest is not expressly allowed, it is not included. *Hemmenway* v. *Fisher*, 20 How.

255. No interest on these costs, therefore, can be claimed up to the date of our decree. The new departure then taken by the libellants in claiming the insurance, opened the matter so as to postpone a final decree in the case in the Circuit Court until the decree now appealed from was made. This decree adjudges to the libellants their costs in the District Court precisely in accordance with our mandate. All delay in entering the decree was caused by the libellants themselves. If any interest was allowable on the costs in question, it would only have been that accruing from the date of our decree, March 20, 1882, to the time of rendering the decree appealed from, September 22, 1884. In view of the circumstances of the litigation which took place in that period, we do not think that the decree of the Circuit Court is open to objection.

*Decree affirmed.*

Mr. JUSTICE MATTHEWS, with whom concurred Mr. JUSTICE MILLER, Mr. JUSTICE HARLAN, and Mr. JUSTICE GRAY dissented. Their dissenting opinion will be found at page 526 *post*, after the opinion of the court in *The Great Western.*