683 F.2d 42
 The Complaint of RED STAR BARGE LINE, INC. and Red Star
Towing and Transportation Company, as owner and charterer
respectively of the tug Huntington, for Exoneration from or
Limitation of Liability, Plaintiffs-Appellees,
v.
NASSAU COUNTY BRIDGE AUTHORITY, Defendant-Appellant.
 No. 1053, Docket 82-7057.
 United States Court of Appeals,
Second Circuit.
 Argued April 23, 1982.
Decided June 23, 1982.
 
 Marshall G. Kaplan, Brooklyn, N. Y., for defendant-appellant.
 Stephen J. Buckley, McHugh, Heckman, Smith & Leonard, New York City, for plaintiffs-appellees.
 Before OAKES, CARDAMONE, and WINTER, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 Time is the stuff of which admiralty cases are made. On November 22, 1976, the tug Huntington struck the Nassau County Bridge Authority's Atlantic Beach Bridge causing more than $190,000 of damage. Red Star Barge Line, Inc. and Red Star Towing and Transportation Company (hereinafter collectively Red Star), as owner and charterer of the tug, sought limitation of liability under 46 U.S.C. §§ 183(a) and 185. This appeal, six years later, is from a judgment of the United States District Court for the Eastern District of New York, Edward R. Neaher, Judge, sustaining the limitation petition and awarding the sum of $135,000 to the Bridge Authority together with interest from the date of collision at the rate of 6%. The Bridge Authority argues that the valuation was insufficient and, additionally, that the rate of 6% was inadequate.
 
 
 2
 We start with the holding in Norwich Co. v. Wright, 80 U.S. (13 Wall.) 104, 20 L.Ed. 585 (1871), that the owner's interest in the ship is to be calculated according to its value after the collision has taken place. See G. Gilmore & C. Black, The Law of Admiralty 906-07 (2d ed. 1975). This may be easier said than done, for the valuation of older tugs is evidently a very tricky business. The Huntington was originally purchased for $393,000 in 1951 by Red Star Towing and Transportation Company. In an intercompany transaction in the 1970s, title was transferred to Red Star Barge Line, Inc. for $65,600. In the limitation proceeding Red Star claimed the tug's value to be $75,000, although the company carried hull insurance in the sum of $250,000. The market in older tugs is apparently very thin at best. There was evidence that reproduction of the tug in 1976 would cost $1,150,000. The book value of the tug just one month after the accident was $40,668. The tug operated at a loss in 1976 in excess of $59,000. Based on this evidence, the commissioner appointed by the court valued the tug at $112,000. Both the owners and the Bridge Authority excepted to this valuation.
 
 
 3
 The principal additional evidence at the subsequent hearings before Judge Neaher was that of a marine owner who had purchased a tug known as the Sea Traveller in May 1976 for $99,500 and then insured it for $185,000, the value placed upon the tug by United States Salvage Association, Inc. for insurance purposes. The Sea Traveller was the only tug comparable to the Huntington that had recently been sold or purchased. The Sea Traveller is three years younger than the Huntington, and 68 feet in length as opposed to the Huntington's 91 feet. It has a gross tonnage of 93 and a net tonnage of 63, compared to the Huntington's 144 gross and 98 net tonnages. The Sea Traveller has 680 horsepower twin-screw engines (which constitute half the value of a tug according to the witness), as opposed to the Huntington's 1280 horsepower single-screw engine. The Huntington's greater motor power means that it can push larger barges than could the Sea Traveller; on the other hand, the Sea Traveller's two engines make it more maneuverable than the Huntington and, in case of engine difficulty, more reliable.
 
 
 4
 The district court chose the figure of $135,000 as the ultimate valuation of the Huntington. Standing in the abstract this would not be plainly erroneous; the figure is well within the range of what "a reasonable judgment having its basis in a proper consideration of all relevant facts" could produce. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925). See also Carl Sawyer, Inc. v. Poor, 180 F.2d 962, 963 (5th Cir. 1950); The Black Eagle, 87 F.2d 891, 893 (2d Cir. 1937). But the district court arrived at the figure of $135,000 by employing a formula. It took the ratio of the insured value of the Sea Traveller to its fair market value and applied that ratio to the Huntington's insured value to ascertain the Huntington's fair market value. Thus, applying the ratio of $185,000 over $99,500 to the $250,000 insured value of the Huntington, the court valued the Huntington at $135,000.
 
 
 5
 The Bridge Authority rightfully claims that this method of valuation was erroneous. Indeed, the Standard Oil case emphasizes that "(t)he ascertainment of value is not controlled by artificial rules." 268 U.S. at 156, 45 S.Ct. at 467. The trial court's artificial formula suffered from the additional difficulty that the two tugs were dissimilar in several respects. While the court did announce that it had engaged in a "consideration of all the evidence presented," and it may have done so, nevertheless the formula as employed did not take into consideration the remaining evidence including witnesses' opinions, the cost of reproduction less depreciation, and the earning capacity and condition of the vessel.
 
 
 6
 We believe, however, that the ultimate figure can be sustained on the basis of all of the properly admitted evidence, including the vessel's insured value. Although the insured value insures potential liabilities as well as the hull value, it may be taken into consideration, see Carl Sawyer, Inc. v. Poor, 180 F.2d at 963. At the same time, the insurance value is not necessarily the equivalent of actual value. At least in the case of the tug Sea Traveller, the insured value was considerably more than the actual value. We see no reason at this stage to overturn the trial court's ultimate finding as clearly erroneous based upon all of the evidence adduced. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 1147 (1948). Had Red Star appealed or cross-appealed claiming that the formula as applied to it was prejudicial, we might be required to reverse. But on the Bridge Authority's appeal we may and do affirm the amount of the award, because there is nothing in the evidence to demonstrate that $135,000 is too low a valuation. In so deciding we do not imply approval of the proposition that the owner's insurance proceeds are not available to the injured party, a proposition that a 5-4 majority in 1886 sustained in the tripartite holding in Place v. Norwich & New York Transportation Co. (The City of Norwich), 118 U.S. 468, 65 S.Ct. 1150, 30 L.Ed. 134 (1886); Dyer v. National Steam Navigation Co. (The Scotland), 118 U.S. 507, 6 S.Ct. 1174, 30 L.Ed. 153 (1886); and Thommessen v. Whitwill (The Great Western), 118 U.S. 520, 6 S.Ct. 1172, 30 L.Ed. 156 (1886). But unless and until the Supreme Court reexamines that holding, there is absolutely nothing we can do to counteract what Gilmore and Black have indicated is "economic obsolescence." The Law of Admiralty, supra, at 822 (referring to limitation of liability generally).
 
 
 7
 The remaining question relates to prejudgment interest. Without explanation, the trial court awarded interest at the 6% legal rate. Red Star argues that the 6% rate is required by Rule F(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims.[1] Rule F(1) provides that when the vessel owner, rather than transferring his interest in the vessel or depositing into court the value of his interest, deposits approved security for that sum (which the Red Star did in the form of a surety bond in the sum of $75,000), he must also give security for interest at the rate of 6% per annum from the date of the security. We think Red Star is correct with respect to the security that it supplied, i.e., $75,000, and the 6% rate of interest thereon we think is proper. But as to the difference between $75,000 and the ultimate $135,000 award, i.e., $60,000, the court was not bound to the 6% figure by 46 U.S.C. § 185 or by the Supplementary Rules. Rather, the court should have applied general principles as to prejudgment interest, see Circle Line Sightseeing Yachts, Inc. v. Storbeck, 325 F.2d 338, 340-41 (2d Cir. 1963); Petition of Wills Lines, Inc., 251 F.2d 306, 310 (2d Cir.), cert. denied sub nom. Wills Lines, Inc. v. Tankport Terminals, Inc., 356 U.S. 939, 78 S.Ct. 782, 2 L.Ed.2d 814 (1958). We recently noted that the district court has "broad discretion to fix the rate of interest," Independent Bulk Transport, Inc. v. The Vessel "Morania Abaco," 676 F.2d 23, 27 (2d Cir. 1982), and advised that "(p) laintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." Id. With this guideline in mind, we remand to the district court for the exercise of its broad discretion in respect to the interest on the $60,000 awarded over the security furnished.
 
 
 8
 Judgment affirmed in part, and reversed and remanded in part for proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Rule F(1) reads as follows:
 Time for Filing Complaint; Security. Not later than six months after his receipt of a claim in writing, any vessel owner may file a complaint in the appropriate district court, as provided in subdivision (9) of this rule, for limitation of liability pursuant to statute. The owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of his interest in the vessel and pending freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of the statutes as amended; or (b) at his option shall transfer to a trustee to be appointed by the court, for the benefit of claimants, his interest in the vessel and pending freight, together with such sums or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of the statutes as amended. The plaintiff shall also give security for costs and, if he elects to give security, for interest at the rate of 6 per cent per annum from the date of the security.