## THE BLACK EAGLE.

### Petition of AMERICAN DIAMOND LINES, Inc.

### No. 151.

Circuit Court of Appeals, Second Circuit.
Feb. 8, 1937.

See, also, 8 F.Supp. 277.

Barry, Wainwright, Thacher & Symmers and Hunt, Hill & Betts, all of New York City (Earle Farwell and John W. Crandall, both of New York City, of counsel), for appellants.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and W. J. Nunnally, Jr., both of New York City, of counsel), for respondents.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for Officers and Crew of Concordia.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

While the Black Eagle was on a voyage from Rotterdam, Holland, to New York, on March 5, 1934, she collided with the vessel Concordia, resulting in the total loss of the latter and her cargo. The Black Eagle was damaged and, after rescuing the crew of the Concordia, proceeded and arrived in New York March 8, 1934. The American Diamond Lines, Inc., as the owner of the Black Eagle, filed a petition for limitation of liability which was granted. The interlocutory decree was entered awarding damages and providing that the amount to which the petitioner's liability was to be limited should be determined before a commissioner. The commissioner found the value of the Black Eagle in damaged condition to be $250,000, to which he added a sum of $5,000 for spare parts, plus the value of stores, foodstuffs, freight, and passenger moneys, totaling $11,778.60. He also allowed $13,660, the sum paid under a mail contract with the United States government. Appellants contend that the valuation of the vessel is excessive and that the $5,000 for spare parts together with the $13,660 should be disallowed.

In estimating the value of the Black Eagle, the experts said it was impossible to obtain evidence of contemporaneous sales of similar vessels. The Black Eagle originally had a speed of 10 knots but was reconstructed into a 13-knot vessel in 1932 to meet the requirements of the mail contract. Other vessels similarly reconstructed have been kept in service but not sold. The Black Eagle was purchased by the American Diamond Lines, Inc., October 23, 1931, for $127,156.25, and $169,785.33 was expended on her during the year 1932 for the primary purpose of increasing her speed. The commissioner found, and the court below approved, that in her damaged condition she was worth not less than $250,000.

Both parties called experts who differed in their valuations. Though the cost of reproduction at the date of valuation may ordinarily be considered (see Standard Oil Co. of New Jersey v. So. Pac. Co., 268 U.

S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890), it led in this case to exaggerated figures which were properly ignored. Where there is no market value that may be established by contemporaneous sales of like property, other evidence is resorted to. Standard Oil Co. of N. J. v. So. Pac. Co., supra. In fact, the parties are not in conflict as to the principle of valuation to be followed. To the original purchase cost in 1931, there was added the increase in value due to reconstruction in 1932 and depreciation was allowed to March 1934. The divergence in the estimates of value reached by expert witnesses for both sides was due to the difference of opinion as to the relation between the total cost of reconstruction and the actual enhancement in value of the Black Eagle. The appellants insisted that much of the total cost went into maintenance and did not increase the sound value of the vessel. The estimate of appellants' witnesses ranged from a low of $140,000 to a high of $175,-000; those of the appellees' witnesses from a low of $250,000 to a high of $261,000. Not all of these estimates include a deduction of $13,850 for the cost of repairs to the Black Eagle.

■· There is some evidence justifying the valuation of $250,000, and we therefore accept it. The opinions of experts appointed to fix the market value of a vessel under the circumstances existing here, while mere estimates, supplied a basis for the valuation approved below and, since there is some justification for the acceptance of the value arrived at, we are not warranted in reversing. LaBourgogne, 144 F. 781 (C.C.A.2), affirmed 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973.

■ A separate allowance of $5,000 was made for spare parts. This of necessity must refer to the equipment which was aboard the Black Eagle and which was required by the American Bureau of Shipping. Indeed, there is a probability that the value of this equipment was included in the gross value of the ship, but, if not, there was no evidence of valuation of these parts and this sum should not have been allowed. The appellees were asked to produce a list of the spare parts on board the Black Eagle. The list referred to as Exhibit L is in evidence. The items there set forth have no reference to the spare parts furnished by the shipbuilding company consisting of reduction gears, tail shaft, and propeller. These were suitable for use on the six vessels, including the Black Eagle, which were reconstructed in 1932 and were kept on shore, available for installation in the event of emergency. The cost of these parts was $37,580, one-sixth of which was included in the itemized statement of the work done on the Black Eagle. The testimony is uncontradicted that none of the spare parts referred to belonged to the Black Eagle nor were they on board nor did they form a part of her equipment. The parts actually on board, shown by Exhibit L, were part of the equipment of the vessel. These were presumably included in the valuation of the vessel in operating condition ready to go to sea and consisted generally of gauge glasses, a pressure gauge for the boilers, studs, nuts, rings, springs, etc. for the turbine; studs, nuts, bushes, pins, etc., for the reduction gears, and some spare electrical equipment. The commissioner, without any aid from the testimony, valued them at $5,000 and added that to the ship's value. There was no testimony which justified his arrival at this figure. This sum must therefore be deducted.

■ On August 3, 1931, the appellants entered into a contract with the government through the Postmaster General for ocean mail service on route 53 under the provisions of the Merchant Marine Act (45 Stat. 689, 46 U.S.C.A. § 891 et seq.). The policy and primary purpose of such contracts are referred to in the act (41 Stat. 988, 46 U.S.C.A. § 861). The appellants' mail contract provided for carriage of the United States mails from North Atlantic ports to Rotterdam and Antwerp on a schedule prepared by the Postmaster General, including not less than 72 and not more than 108 trips per annum on that branch of the route. The mails were to be carried eastbound only with a minor exception to be presently noted. The contract provided for the transportation of mail, post office officials and accredited inspectors, post office supplies and mail equipment; and it required the appellants to carry American-born cadets or apprentices on all ships carrying the mail. Another provision required that the ship carry parcel post mail of United States origin being returned from foreign countries as undeliverable, any United States military or naval mails, and any United States mail bags, "without additional charge." And, in consideration of the

faithful performance of this service, compensation was paid monthly "based upon the mileage on the outbound voyages by the shortest practicable route between the ports mentioned."

The appellants contend that this contract was a subsidy and not compensation for carrying the mails. But, without passing on this question, we are to determine whether the payment for carrying the mail on the eastbound trip constitutes "freight then pending" on the return voyage which must be surrendered in this limitation proceeding. Rev.St. § 4283 (46 U.S.C.A. § 183). "Freight then pending" simply refers to the earnings of the voyage. The Main v. Williams, 152 U.S. 122, 14 S. Ct. 486, 38 L.Ed. 381; The San Simeon, 63 F.(2d) 798 (C.C.A.2), certiorari denied Pacific Atlantic S. S. Co. v. Moore-Mack Gulf Lines, Inc., 290 U.S. 643, 54 S.Ct. 61, 78 L.Ed. 558.

$13,660 was the amount earned, measured by the mileage on the eastbound voyage. It was considered below that this was freight on the westbound voyage during which the collision occurred. If it were possible to regard the trip to Rotterdam and back as a single voyage, we may assume that by analogy to The San Simeon, supra, the aforesaid amount would represent freight pending on the westward voyage even though completely earned on the eastward voyage. In LaBourgogne, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, it was said that the term "voyage" will not always have a fixed meaning and that in some instances it may comprehend a round-trip voyage. But from that opinion it is clear that the eastbound and the westbound trips of this vessel were separate voyages. Since the voyages were separate and distinct, we must inquire what was earned on the westbound voyage. And the answer to that is clear enough. Under the contract, the only duty on return trips was to carry undelivered parcel post mail, military or naval mails and mail bags, "all without additional charge." It was established that no undelivered mail had ever been carried on the appellants' vessels and, though mail bags had been carried half a dozen times, none were shipped on the Black Eagle on this return voyage. The terms of the contract indicate that the services on return trips were regarded as minor and incidental and were to be performed "without additional charge." Payments to the appellants were measured by the mileage on the east-

bound voyage, and, though this fact alone is not decisive, it is corroborative of the other facts mentioned.

Restricting our consideration to the mail services, which constitute the only quid pro quo mentioned in the contract which could possibly fall within the category of pending freight, it is plain that whatever was earned necessarily was for the services on the eastward voyage. We hold that these earnings of freight may not be included since they belong to the previous voyage of the vessel. It must therefore be deducted from the sum to be surrendered in compliance with the limitation decree.

Decree modified accordingly.