264 F.2d 339
 In the Matter of Petition of UNITED STATES DREDGING CORPORATION as owner of THE Motor Launch NIP for exoneration from or limitation of liability.
UNITED STATES DREDGING CORPORATION, Appellant,
v.
Julia Nora McMahon KROHMER, as Administratrix of the Goods, Chattels and Credits of George William Krohmer, deceased, Appellee.
 No. 133.
 Docket 25287.
 United States Court of Appeals Second Circuit.
 Argued January 19, 1959.
 Decided March 6, 1959.
 
 Christopher E. Heckman, New York City, for appellant.
 Edward J. Behrens, New York City for appellee.
 Before HAND and WATERMAN, Circuit Judges, and BYERS, District Judge.
 HAND, Circuit Judge.
 
 
 1
 This appeal is from an order of Judge Abruzzo, dismissing the appellant's petition for limitation of liability under § 183 of Title 46 of the U.S.C.A., unless it surrendered five additional vessels owned by it to answer the claims for injuries or death of two persons who had been employed on board the appellants' launch, "Nip." After the petition had been filed the appellee, widow of one of the petitioner's employees, sued the appellant for the death of her intestate due to the appellant's negligence in allowing a "flash fire" to occur on the "Nip" which blew him overboard and caused his death. Another employee on the "Nip" had also threatened to sue for injuries caused by the same accident. The only issue is whether the "Nip" is the only vessel that the appellant must surrender in order to limit its liabilities, or whether it must also surrender five other vessels, that were engaged in the same venture at the time. Judge Abruzzo referred the cause to a commissioner to report the facts, who recommended that the appellant must surrender the additional vessels. The judge affirmed the findings with a conceded modification, and denied the appellant's petition for an injunction. The facts reported were found as follows.
 
 
 2
 "On November 9, 1948 a contract was entered into between Trustees of the Town of Huntington and U. S. Dredging whereby U. S. Dredging was engaged to dredge portions of Huntington Bay and Huntington Harbor indicated on certain maps or surveys; to remove gravel therefrom; to load the gravel on vessels and carry the gravel away. * * *
 
 
 3
 "* * * U. S. Dredging to fulfill its part of the contract used the Dredge Magic City, the Oil Screws Nip, Tuck and New Harbor, U. S. D. No. 2, the Arthur McCabe the Roy H. and the Stockton. During the year 1955 and on December 22, 1955, * * * the Motor Launches Nip, Tuck and New Harbor transported men, who operated the dredge, to and from the Magic City; these motor launches moved the dredge from place to place, they transported empty barges alongside the dredge and removed full barges to moorings where they would be taken in tow by larger tug boats and towed to various places. These motor launches received their fuel and water from the Magic City and also were repaired by the mechanics who served aboard the Magic City. The motor launches were moored alongside the Magic City when not in use excepting when they were sent to a shipyard for painting. Usually the Magic City was moved by one or all of these motor launches, however, on a few occasions a larger tug moved the Magic City, but one of these motor launches always helped and assisted in the moving of the Magic City. These launches also towed the fuel boat Roy H. and the Stockton, the barge upon which all spare parts, tools and other materials were stored, to and from the Magic City. These launches also moved the crane Arthur McCabe into position so that it could lift the anchors and cables of the Magic City before she could be moved. The crane like the Magic City had no means of self propulsion and therefore like the Magic City had to be towed by the launches. Hence in order for U. S. Dredging to perform its part of the contract in Huntington Harbor the Magic City did the actual dredging and the motor launches transported the crews aboard; towed the barges that carried water, fuel and materials to the Magic City; towed the cranes that lifted the anchors and cables and towed the Magic City from place to place when it was necessary. * * * [I]t was impossible for the dredge to operate and work unless some craft brought the crews aboard, transported the water and fuel barges to and from the dredge, lifted the anchors, towed away the gravel barges and towed the dredge from place to place."
 
 
 4
 It is a ready explanation of the limitation statute that it is derived from the ancient personification of the ship as a wrongdoer, but we are assured (In re East River Towing Co., 266 U.S. 355, 366, 45 S.Ct. 114, 69 L.Ed. 324), that "the origin of the Admiralty rule * * * cannot be answered with confidence from the historical material now [1924] at hand." When the shipowner's liability presupposes no preceding consensual relation with the injured party, but arises from a base invasion of his interests, it can be safely asserted that the surrender of only the damage feasant vessel is necessary in order to secure limitation. Deep Sea Tankers v. The Long Branch, 2 Cir., 258 F.2d 757, 773-774. Moreover, although the shipowner had made a contract to be performed by several tugs to tow the claimant's barge, as part of a flotilla, after the barge was separated from the others, and was being towed to its destination by a single tug, we held that the limitation was conditional upon the surrender of that "vessel" only. The George W. Pratt, 2 Cir., 76 F.2d 902. We regarded the original "venture" as ended and a new one as being under way. The case at bar is not that. The launch, "Nip," at the time of the "flash fire" was going to fetch an empty barge from where she lay and put her alongside the "Magic City" to be there laden with gravel and then taken away by one of the launches, like the "Nip," to be discharged outside the Harbor of Huntington. Not only was the "Magic City" without power of propulsion, but the men who worked upon her had to be taken back and forth at night by the launches; her oil and other supplies to be brought to her by still other craft. In short, all these attending "vessels" were necessary to the performance of their owner's contract with the town.
 
 
 5
 In Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663, although the case arose under the Harter Act, the Court resolved it by application of the same rules that limit a shipowner's liability; and following the doctrine of The Columbia, 9 Cir., 73 F. 226, held that, when a barge and tug were transporting a cargo of barley, both were to be deemed a single "vessel," and the tug must be surrendered as well as the barge. In Standard Dredging Co. v. Kristiansen, 2 Cir., 67 F.2d 548, a seaman employed on a dredge was injured while working on an unseaworthy barge, which was used as a tender to supply oil to the dredge, and which at the time was not made fast to her. We held that the dredge must be surrendered as well as the barge, because each was part of the means that the shipowner was using to perform its contract. The owner had assumed "contractual obligations" with the claimant, and that involved any ships that it devoted to the performance of its contract with a third person. As a new question it is hard to see why the shipowner's liability should be broader when it presupposes a consensual relation with the claimant than when it rests upon the invasion of the interest of a person with whom the owner has had no preceding relation. However, it is at least doubtful whether the motives that originally lay behind the limitation are not now obsolete; and certainly we should now have no warrant for extending its scope, when the liability is for personal injury arising from the shipowner's fault.
 
 
 6
 Order affirmed.