The Complaint of NORTH AMERICAN TRAILING COMPANY as Owner, and NATCO, a Delaware Limited Partnership, as Charterer and Operator of the Vessel NORTHERLY ISLAND for Exoneration from or Limitation of Liability.

Civ. A. No. 90–1793–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

May 1, 1991.

---

Henry P. Bouffard, Shuttleworth, Ruloff, Giordano & Kahle, P.C., Virginia Beach, Va., for North American, etc.

Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for North Carolina Power and Cape Hatteras.

Guilford D. Ware, Ann K. Sullivan, James L. Chapman, IV, Crenshaw, Ware & Martin, Norfolk, Va., Lacy H. Thornburg, Atty. Gen., Grayson G. Kelley, Asst. Atty. Gen., Dept. of Justice, Raleigh, N.C., for State of N.C.

Michael A. Rhine, Asst. U.S. Atty., Norfolk, Va., Debra J. Kossow, Sr. Admiralty Counsel, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Robert G. Winters, Reynolds, Smith & Winters, Norfolk, Va., for County of Dare, N.C.

Stephen C. Swain, Thomas B. Kelly, Clark and Stant, Virginia Beach, Va., for Hattaras Inn, Inc.

A. Jackson Timms, Benjamin V. Madison, III, D. Arthur Kelsey, Hunton & Williams, Norfolk, Va., Robert Carl Voigt, Sr. Atty., Carolina Tel. & Tel. Co., Tarboro, N.C., for Carolina Tel. & Tel.

### OPINION AND ORDER

DOUMAR, District Judge.

The vessel NORTHERLY ISLAND is a hopper dredge owned by North American Trailing Company and operated under a bareboat charter by NATCO, a limited partnership, both plaintiffs in this action (collectively "North American"). During October 1990, the NORTHERLY ISLAND was engaged in dredging in Oregon Inlet, North Carolina, under a contract between NATCO and the Army Corps of Engineers. In the early morning of October 26, during a severe storm, the NORTHERLY ISLAND collided with the Herbert C. Bonner

Bridge, damaging the bridge and utility cables strung along the bridge.

The plaintiffs filed this Complaint for Exoneration from or Limitation of Liability, pursuant to 46 U.S.C.App. § 183(a). On November 1 this Court entered an Order for an Ad Interim Stipulation setting the value of the NORTHERLY ISLAND at $5,600,000 and ordering the plaintiffs to post a bond in that amount. Various parties filed answers to the complaint, claims for damages resulting from the casualty, and motions to require the plaintiffs to increase security. North American moved for summary judgment on the claims of North Carolina Power Company, Hatteras Inn, and Alden and Janice Smith.

█ The Court heard these motions on March 7, 1991. At that hearing the claims of North Carolina Power Company, Hatteras Inn, and Alden and Janice Smith were dismissed on the reasoning of *Matter of Marine Navigation Sulphur Carriers*, 507 F.Supp. 205 (E.D.Va.1980), which held that indirect economic losses based on business expectations are not recoverable from a tortfeasor who prevents passage on a road or shipping lane. The Court also heard argument on the motions to increase security. On March 29, April 1, and April 3, 1991, the Court heard evidence and further argument on the motions to increase security, and those motions are now ready for decision.

A vessel owner may limit its liability for any injury by collision to "the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 U.S.C.App. § 183(a). When damages exceed the limitation fund, claimants are compensated in proportion to their respective losses. 46 U.S.C.App. § 184. In limitation proceedings, the vessel owner is thus interested in setting a low value for its vessel, while the claimants seek a high value.

Three issues are before the Court. First, what is the value of the NORTHERLY ISLAND? Second, should the value of NATCO's contract with the Army Corps of Engineers be included in the limitation fund as pending freight? Third, should the value of the M/V COLORADO RIVER, a vessel attending the NORTHERLY ISLAND, be included in the limitation fund under the "flotilla doctrine"?

For the reasons stated below, the Court FINDS that the value of the NORTHERLY ISLAND, for purposes of limitation of liability in this case, is $7,143,501. The Court HOLDS that $588,000, the value of NATCO's contract with the Corps of Engineers, should be added to the limitation fund as pending freight. Finally, the Court HOLDS that the value of the M/V COLORADO RIVER should also be included in the limitation fund, but shall only be available to satisfy the claim of the United States, if necessary, and shall not be available to satisfy the other claims, directly or indirectly.

## I. VALUE OF THE NORTHERLY ISLAND

█ The law is well settled that the value of the vessel is to be determined at the conclusion of the voyage during which the casualty occurred; that is, the value immediately after the casualty. When the vessel is repairable, this ordinarily is the market value of the vessel as it then exists, less the cost of repairs. *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 20 L.Ed. 585 (1871); *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1925); *Petition of Bloomfield Steamship Co.*, 422 F.2d 728 (2d Cir.1970).

In *Standard Oil* the Supreme Court set forth the basic guidelines for ascertaining the value of a vessel.[1] The court should look first to the market value of the vessel, as established by evidence of either the actual sale of the vessel or contemporaneous sales of comparable vessels. 268 U.S. at 155, 45 S.Ct. at 466–67; *see also Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir.1950); *In re Petition of Banker's Trust Co.*, 569 F.Supp. 386, 390 (E.D.Pa. 1983).

---

**1.** Although *Standard Oil* concerned valuation of a vessel for the purpose of assessing damages for the loss of that vessel, the same principles apply in limitation proceedings. *In re Petition of Banker's Trust Co.*, 569 F.Supp. 386, 390 (E.D. Pa.1983).

If there is no market for the vessel, or if sales of similar vessels are too few in number to indicate its market value with reasonable probability, the court must use other methods of arriving at its value. *Standard Oil*, 268 U.S. at 155, 45 S.Ct. at 466–67; *see also Barton v. Borit*, 316 F.2d 550, 552–53 (3d Cir.1963); *Carl Sawyer, Inc. v. Poor*, 180 F.2d at 963. The court's objective is still to ascertain as nearly as possible

> the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser willing to buy.

*Standard Oil*, 268 U.S. at 155–56, 45 S.Ct. at 467. The Supreme Court indicated that the "cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value." *Id.* at 156, 45 S.Ct. at 467. The Court specifically noted that depreciation should be taken into some account, although it did not establish a rule for determining depreciated value. *Id.* at 158, 45 S.Ct. at 467–68. Finally, the Court cautioned that the

> ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.

*Id.* at 156, 45 S.Ct. at 467.

Numerous courts have taken the reconstruction cost depreciated as the value of the vessel. However, the reconstruction cost depreciated may not always indicate the true market value. *The Black Eagle*, 87 F.2d 891, 893 (2d Cir.1937); *The Steel Inventor*, 36 F.2d 399, 400 (S.D.N.Y.1929). In such cases, it is appropriate to consider other types of evidence, including the opinions of marine surveyors, the condition of repair of the vessel, the insured value, and so forth. *Carl Sawyer, Inc. v. Poor*, 180 F.2d at 963; *In re Petition of Banker's Trust Co.*, 569 F.Supp. at 390. Valuation in the absence of a market is flexible, and no single factor is determinative. "Rather, the basis of valuation is a composite one

which gives an end result in each instance approximating actual value as closely as possible." *Ozanic v. United States*, 165 F.2d 738, 740 (2d Cir.1948), *quoted in In re Petition of Banker's Trust Co.*, 569 F.Supp. at 390.

In this case the parties agree that there is no ascertainable market for the NORTHERLY ISLAND. The NORTHERLY ISLAND is a unique type of hopper dredge, which is itself a relatively uncommon type of vessel. Private companies have only been building hopper dredges since the late 1970s, and sales of similar vessels are extremely rare.

■ At present, there is likely *no* market for the NORTHERLY ISLAND. Since being repaired, the vessel has remained unused in Norfolk awaiting a need for its services. The Court is of the opinion that if the NORTHERLY ISLAND were sold in an *in rem* action at public auction, it would fetch a price of no more than two or three million dollars. However, the market for such vessels is likely very elastic, and this dredge might obtain a much greater price several months from now if the dredging business were to pick up. In any event, in the absence of evidence of the NORTHERLY ISLAND's true market value or evidence of recent sales of comparable vessels, and because there has been no evidence of value based upon expected or probable income from the vessel, the Court must look to other indicia of value.

### A. Reproduction cost depreciated

The parties appear to have agreed that the best measure of value of the NORTHERLY ISLAND is the vessel's reproduction cost depreciated. Each side presented an expert in the valuation of hopper dredges, and the issue involves the application of expert testimony. Both Mr. Harry Ottaway, presented by North American, and Mr. E.G. Webster, presented by the claimants, seemed qualified and experienced. Each seemed well-versed in the nature of hopper dredges and in the methods of their valuation. However, the Court finds that Mr. Ottaway was more credible as a witness and that his methodology in this case

was more reasonable. The Court is guided largely by Mr. Ottaway's testimony.

Mr. Ottaway was first involved in the valuation of the dredge in December 1990, when he was contacted by the P & I Club and asked for an appraisal and damage survey. Mr. Ottaway testified that after he was unable to find reports of any recent sales of similar vessels, he referred to the construction costs of other hopper dredges —namely, the MANHATTAN ISLAND, the SUGAR ISLAND, and the PADRE ISLAND—listed in records compiled by the Maritime Administration. *Exhibit 26.* The MANHATTAN ISLAND cost $13,039,883; the SUGAR ISLAND $15,248,099; and the PADRE ISLAND $16,590,625.[2] Mr. Ottaway also learned from the Maritime Administration that the cost of another hopper dredge, the DODGE ISLAND, was $16,-570,000. *Exhibit 27.* These vessels were all built by Southern Shipbuilding Corp. for North American Trailing Co. or its parent NATCO Limited Partnership. These vessels are all significantly larger than the NORTHERLY ISLAND, each having a hopper capacity of over 2500 cubic meters to the NORTHERLY ISLAND's 1651 cubic meters, and each having gross tonnage of over 2300 tons to the NORTHERLY IS-LAND's 983 tons. *Exhibit 25.*

Mr. Ottaway took the construction costs of the larger vessels and made a downward adjustment to account for the smaller size of the NORTHERLY ISLAND. Although a hopper dredge would be outfitted with some of the same dredging equipment whether large or small, obviously the material and labor costs are significantly less in construction of a smaller vessel. A number of the witnesses also testified that by virtue of having a gross tonnage under 1000 tons, the NORTHERLY ISLAND could be constructed more cheaply because it did not have to comply with various construction regulations applicable to vessels in excess of 1000 tons. In addition, the NORTHERLY ISLAND has a less sophisticated steering and propulsion system, further decreasing its construction cost relative to its larger cousins.

Through this rationalization Mr. Ottaway arrived at a rough estimated construction cost of $10,000,000. At this point, he inquired of the P & I club of the construction cost stated by the vessel owner, and was told that the actual construction cost was $9,166,695. *See Exhibit 10.* This is the value consistently stated by North American in the years prior to the casualty. A North American Trailing 1990 internal accounting depreciation schedule lists the dredge's construction cost at $9,166,665. *Exhibit 13.*

Mr. Ottaway added to the $9,166,695 figure the sum of $197,953, the cost of hull, plate and framing work performed in 1984. Mr. Ottaway felt that this work, although listed by the owners as a capital improvement, should be considered original construction. This gave a construction cost of $9,364,648, which Mr. Ottaway rounded up to $9,365,000. (This also reduces the reported cost of capital improvements, *see Exhibit 9,* by $197,953.)

Mr. Ottaway then performed various calculations to confirm the accuracy of his estimate and of North American's reported construction cost. He first compared the construction costs of the various hopper dredges based on their hull cubic capacity, and arrived at the following results:

| Vessel | Year | Cost | foot[3] | $/foot[3] |
|---|---|---|---|---|
| MANHATTAN ISLAND | 1977 | 13,039,883 | 296,270 | 44.01 |
| SUGAR ISLAND | 1979 | 15,248,100 | 296,270 | 51.47 |
| DODGE ISLAND | 1980 | 16,500,000 | 296,270 | 55.70 |
| PADRE ISLAND | 1981 | 16,590,625 | 296,270 | 56.00 |
| NORTHERLY ISLAND | 1983 | 9,365,000 | 159,360 | 58.77 |

2. Unless otherwise stated, all prices are rounded to the nearest dollar.

*Exhibit 28.* Mr. Ottaway next performed the same comparison, but by hopper capacity rather than hull capacity. He arrived at these results:

| Vessel | Year | Cost | meter$^3$ | $/meter$^3$ |
|---|---|---|---|---|
| MANHATTAN ISLAND | 1977 | 13,039,883 | 2738 | 4762.56 |
| SUGAR ISLAND | 1979 | 15,248,100 | 2752 | 5540.73 |
| DODGE ISLAND | 1980 | 16,500,000 | 2738 | 6026.30 |
| PADRE ISLAND | 1981 | 16,590,625 | 2800 | 5925.22 |
| NORTHERLY ISLAND | 1983 | 9,365,000 | 1651 | 5672.32 |

---

*Exhibit 29.* Mr. Ottaway attributed the gradual increase in price per unit of volume to inflation. Mr. Ottaway did not offer these comparisons as a method of valuing the NORTHERLY ISLAND, but found that the dredge's reported construction cost of $9,365,000 was a reasonable price according to these comparisons.

Having satisfied himself that $9,365,000 was a reasonable measure of the NORTHERLY ISLAND's original construction cost, Mr. Ottaway then calculated how much it would cost to construct the vessel were it to be reconstructed in 1990. By extrapolating from the Maritime Administration's Index of Estimated Shipbuilding Costs in the United States, *Exhibit 30* (an index which compares shipbuilding costs between different years), Mr. Ottaway determined that it would have cost $10,864,863 to construct the NORTHERLY ISLAND in 1990. *Exhibit 31.* This is the vessel's reconstruction cost.

Mr. Ottaway next determined the reconstruction cost depreciated. To determine depreciation, Mr. Ottaway used a 20–year, 5% reducing balance scale, over the seven years between 1983 and 1990. A reducing balance (or declining balance) measure of depreciation is like an inverted compounding of interest. Depreciation after one year is 5% of 100% of the original value, leaving 95%; after the second year is 5% of 95%, leaving 90.25%; and so on. In con-

trast, straight-line depreciation merely reduces value by 5% of the original value each year, so that after 20 years the value is zero. The Court believes the reducing balance measure is more appropriate, for by that measure the property always retains some value, such as that which might be obtained if sold for scrap.

Using this method of calculating depreciation, Mr. Ottaway found the NORTHERLY ISLAND's reconstruction cost depreciated to be $7,587,260, which he rounded up to $7,600,000. *Exhibit 31.*

Mr. Ottaway next added $274,119 for capital additions, derived from North American's list of capital additions made between 1984 and 1989 (not including the hull, plate and framing work referred to above, included in the construction cost). *See Exhibit 9.* For each capital addition, Mr. Ottaway took the value of that addition and depreciated it from the year of addition to 1990, the year of the casualty. He then totalled those sums and reduced the total by 40%, based on his belief that only 60% of the value of a capital improvement inures to the market value of the entire vessel.[3] This left a total of $274,119. *Exhibit 32.* Mr. Ottaway thus finally concluded that the reproduction cost depreciated (including capital improvements) of the NORTHERLY ISLAND was $7,874,119.

The Court finds that Mr. Ottaway made every attempt to be precise in his calcula-

---

**3.** Mr. Ottaway drew an analogy to the addition to a house of a garage. Although the garage costs $10,000 to build, it would not increase the market value of the house by $10,000.

tions, and that he was careful to confirm the reliability of the construction cost reported by North American by using various methods of estimating the cost. In contrast, the Court felt that the claimants' expert, Mr. E.G. Webster, relied more on speculation, stopped his analysis when he reached a result favorable to the claimants, and made some basic errors which undermined the credibility of his computations.

Mr. Webster did not have available to him the construction cost stated by North American, upon which Mr. Ottaway relied. Mr. Webster testified that he did not request this information from either North American Trailing or Southern Shipbuilding, stating vaguely that the maritime construction industry is very secretive. However, such information was easily obtainable through interrogatories. Instead, Mr. Webster surveyed the NORTHERLY ISLAND in February 1991, prepared a detailed list of the vessel's construction features and equipment, made his own estimates of the costs of each of these items, and totaled these items to reach an estimate of $13,000,000 as the construction cost. *Exhibit 5.*

Mr. Webster then determined the reconstruction cost by adding this estimated cost of construction (depreciated on a 25–year, 4% straight-line basis) to the cost of capital improvements and to the cost of spare parts, as follows:

| | |
|---|---|
| Construction and outfitting cost (1983) | $13,000,000 |
| Less 6⅚ years depreciation (1983–1990) | (3,033,333) |
| Plus spare parts at 10% of construction cost | 1,300,000 |
| Plus Miscellaneous improvements at 5% of construction cost | 650,000 |
| | $11,916,667 |

*Exhibit 1 at 11.* The figures for spare parts and improvements were merely estimates based on a percentage of the estimated construction cost, and were not based on a survey of specific items.

Mr. Webster erred by double-counting the $1,300,000 sum for spare parts. An itemized breakdown of Mr. Webster's estimated construction costs for the dredge, *Exhibit 5*, lists spare parts at $1,300,000 at line 70, which is then added to the other items to reach the construction and outfitting cost of $13,000,000. However, as shown by the table above, Mr. Webster again added $1,300,000 for spare parts, after depreciating the construction and outfitting cost. Instead, by Mr. Webster's methodology, the construction cost should be $11,700,000. The cost of spare parts, which he estimates at 10% of construction cost, would be $1,170,000, if one were to add them. The cost of improvements, which he estimates at 5% of construction cost, should be $585,000, and not $650,000 as listed by Mr. Webster.

Mr. Webster may have also double-counted capital improvements. When he surveyed the NORTHERLY ISLAND after the accident and compiled Exhibit 5, it is not clear whether he differentiated original construction from subsequent improvements.

Mr. Webster also erred in calculating depreciation. Applying a 25–year, 4% straight-line depreciation method, annual depreciation on a $13,000,000 value would be $520,000. Depreciation over 6⅚ years would be $3,553,333. Mr. Edwards' figure of $3,033,333 represents depreciation over only 5⅚ years, which is short by $520,000.

Furthermore, his depreciation figures should be based on an original value of $11,700,000, not $13,000,000. The figure Mr. Webster should have used for annual depreciation is $468,000, resulting in depreciation by $3,198,000 over 6⅚ years. (In addition, Mr. Webster did not depreciate the capital additions.)

Thus, by Mr. Webster's methodology, the value should be calculated as follows:

| | |
|---|---|
| Construction and outfitting cost (1983) | $11,700,000 |
| Less 6⅚ years depreciation (1983–1990) | (3,198,000) |
| Plus spare parts at 10% of construction cost (not depreciated) | 1,170,000 |
| Plus Miscellaneous improvements at 5% of construction cost (not depreciated) | 585,000 |
| | $10,257,000 |

The Court does not agree with Mr. Edwards' itemized estimates of the cost of constructing the NORTHERLY ISLAND. For each component, Mr. Edwards either interpolated a value based on figures he

used in the construction some years earlier of a different, larger hopper dredge; or called a supplier to get a quote for that component; or made an educated guess based on his years of experience in the field. While the Court gives this method some consideration, Mr. Edwards did not corroborate his methodology by any alternative measure of the dredge's value, as did Mr. Ottaway. Furthermore, the Court cannot help but consider the obvious errors and lack of consideration of depreciation. The Court therefore views Mr. Edwards' estimates with skepticism.

The Court chooses to be guided by Mr. Ottaway's calculation of the reconstruction cost depreciated. Like Mr. Ottaway, the Court accepts $9,166,695, the figure stated by North American, as the construction cost. If anything, vessel owners have greater reason to overvalue rather than to undervalue their vessels. A larger valuation would allow increased mortgage financing, larger tax deductions for depreciation, and greater insurance coverage. Moreover, the greatest employer of dredges, the Army Corps of Engineers, allows consideration of depreciation in determination of costs in relation to its dredging contracts. The higher the cost of the dredge, the greater the allowance for depreciation, and the greater price allowed for the contract. Thus the Court finds that the cost of the NORTHERLY ISLAND, as consistently reported by North American in the years before this casualty, is prone to overstatement rather than understatement.

Adding the sum of $197,953 for hull, plate and framing work, the Court sets the 1983 construction cost of the NORTHERLY ISLAND at $9,364,648.[4] Using the Index of Estimated Shipbuilding Costs in the same manner as Mr. Ottaway, see Exhibit 31, the Court finds that $10,864,454 would be the reproduction cost of the NORTHERLY ISLAND at the time of the collision with the Bonner Bridge in 1990.

As to depreciation, the Court again accepts Mr. Ottaway's use of a 20–year reducing balance measure. As discussed above, the Court feels the reducing balance measure of depreciation is preferable to a straight-line measure, because a reducing balance measure always leaves the property with value, such as that which it might obtain as scrap. The Second Circuit has indicated that a reducing balance measure should be used:

"Depreciation" ... does not refer to an annual allowance made for wear and tear or the amount which each year is set aside on the books in a reserve in order that the original cost of the object being depreciated will be wholly written off at the end of its anticipated life span. Rather, it refers to a factor which is determined by subtracting each year a percentage of the residual value of the object carried over from the last year.

Ozanic v. United States, 165 F.2d 738, 741 n. 3 (2d Cir.1948).

Mr. Ottaway testified that a twenty-year useful life is assumed for salt-water vessels such as the NORTHERLY ISLAND. Twenty years is also the measure of the depreciation allowance in contracts with the Army Corps of Engineers. The NORTHERLY ISLAND was completed in late 1983 (see Exhibit 25), giving a depreciation period of seven years by the time of the collision in October 1990.

Using a 20–year, 5% reducing balance measure over seven years, the Court finds that the 1990 reconstruction cost depreciated of the NORTHERLY ISLAND is $7,587,053.

To this figure the Court must add the cost of any capital additions to the NORTHERLY ISLAND, also depreciated. See The Black Eagle, 87 F.2d 891, 893 (2d Cir.1937). The claimants did not challenge North American's schedule of capital additions and their stated value, Exhibits 9, 11, and the Court accepts that schedule (not including the $197,953 for hull, plate and framing work which has already been added to the original construction cost). Of the $557,444 in capital additions remain-

4. A summary of the following calculation of the value of the NORTHERLY ISLAND may be found at the Appendix and Tables 1 and 2.

ing,[5] $117,089 is attributable to electronic equipment (the Hewlett–Packard positioning equipment, the Delnorte positioning equipment, and the Communication and Navigation equipment). The Court finds that electronic equipment becomes obsolete so rapidly that it should be depreciated over a 5–year useful life. The Court thus employs a 5–year, 20% reducing balance measure of depreciation for the electronics, leaving a depreciated value of $64,147 (*see Appendix, Table 1*).

The Court divides the other capital additions into two groups: those which represent true capital additions, and those which merely represent modification or replacement of existing equipment. The Court will add only 60% of the value of the latter, as they do not increase the value of the NORTHERLY ISLAND itself by the full amount of their cost. For both groups the Court uses the 20–year, 5% reducing balance measure of depreciation. The depreciated value of the non-electronic capital additions is thus $222,146 (*see Appendix, Table 2*).

Adding these two sums to the original reconstruction cost depreciated, the Court FINDS that the reproduction cost depreciated of the NORTHERLY ISLAND is $7,873,346.

The Court chooses not to add an additional amount for spare parts. Claimants suggested that spare parts were not included in the construction cost, but offered no evidence of this other than their own speculation. William Pagendarm, general manager of NATCO Limited Partnership, testified that spare parts were included in the original construction cost of $9,166,695, and the Court accepts that testimony. Moreover, testimony indicated that spare parts considered by Mr. Webster were not located on the vessel but were stored at another location or warehouse. In the face of such uncontradicted testimony, spare parts will not be included in the value of the vessel. *The Black Eagle,* 87 F.2d at 893.

### B. Other indicia of value

The Court should limit liability to the reconstruction cost depreciated unless it leads to an exaggerated valuation. *The Black Eagle,* 87 F.2d at 893; *The Steel Inventor,* 36 F.2d 399, 400 (S.D.N.Y.1929). It is thus appropriate for the Court to consider this measure against other indicia of the NORTHERLY ISLAND's value. *Carl Sawyer, Inc. v. Poor,* 180 F.2d 962, 963 (5th Cir.1950); *In re Petition of Banker's Trust Co.,* 569 F.Supp. 386, 390 (E.D. Pa.1983).

Anthony Green, an employee of the Salvage Association which surveys damage for Lloyd's underwriters, estimated the original value of the dredge by multiplying the tons of steel used in construction (estimated at 1800) by a standard cost factor of $1.70/pound, for a total of $6,120,000. To this sum he added an estimated $3,800,000 for outfitting, for a total of $9,920,000. Mr. Green had not appraised a hopper dredge before, however, and the Court accords his testimony less weight than that of Mr. Ottaway.

In 1989 Hull & Cargo Surveyors, Inc., conducted a survey of the NORTHERLY ISLAND on behalf of North American and their insurers. Their four-page report lists the "estimated physical value" as $10,700,-000, and the "estimated replacement value" as $15,000,000. *Exhibit 15.* The preparer of this survey was not called to explain his terms. Furthermore, this appraisal does not differentiate between original construction and subsequent capital additions, nor does it explain its method of valuation or indicate whether the appraiser accounted for depreciation. The Court is not inclined to accord it much weight.

Finally, the claimants have urged the Court to adopt as the NORTHERLY ISLAND's value its insured value. The dredge was originally insured for $10,000,-000, and that sum was never changed, despite depreciation and capital additions. However, insured value is not necessarily equivalent to actual value. *Red Star*

---

**5.** The total figure for capital additions listed at the bottom of Exhibit 9 is incorrect. Rather than $775,397.55, the correct total is $755,-397.55.

*Barge Line, Inc. v. Nassau County Bridge Authority*, 683 F.2d 42, 44 (2d Cir.1982). In numerous cases, courts have set the value of a vessel at considerably less than its insured value. *Id.* (actual value $135,000, insured value $250,000); *see also, e.g., Signal Oil & Gas Co. v. Barge W–701*, 654 F.2d 1164 (5th Cir.1981) (actual value $450,000, insured value $500,000); *Carl Sawyer, Inc. v. Poor*, 180 F.2d at 963 (actual value $30,000, insured value $50,000). The purchase and sale of insurance is often guided by business considerations rather than the actual value of the thing insured. An insurer seeks to protect itself against undue risk, and thus needs some indication that the insured has not vastly overvalued his property, intending to collect the insurance. The insurer thus wants a guarantee that the valuation is in the ballpark, but not necessarily that it represents the true value. In addition, both the insured and insurer may desire a higher valuation, so that the insured may obtain more insurance and the insurer may receive a higher premium. *See generally* Comment, Vessel Valuation: Problems and a Proposal, 5 *The Mar. Law.* 59, 71–72 (1980).

For the same reasons, a survey conducted for insurance purposes, such as that performed by Hull & Cargo, is not necessarily aimed at determining a precise value.

The fact that the insured value of the NORTHERLY ISLAND is greater than the value found by the Court therefore does not call into question the Court's assessment. Furthermore, the fact that the NORTHERLY ISLAND's insured value has remained $10,000,000 from the time of its construction until today indicates that it does not represent true value, which would fluctuate over time.

The Court feels the reproduction cost depreciated of the NORTHERLY ISLAND is the best assessment of its value. The Court thus FINDS that the value of the NORTHERLY ISLAND immediately prior to the collision with the Bonner Bridge was $7,873,346.

*C. Cost of repairs*

Finally, the Court deducts from the value of the dredge the cost of repairs resulting from the casualty. North American states that the cost of repairs attributable to the casualty and necessary for Coast Guard and ABS certification is $729,845. *Exhibits 18–20.* To arrive at this figure, North American deducted from the shipyard invoices those repairs made after the casualty which were " 'owners' repairs," regular maintenance which would have been performed notwithstanding the collision.

Although claimants contest this figure, they have not met their burden of showing that these repairs were not attributable to the casualty. In any event, the Court must consider the state of repair of the vessel. *Carl Sawyer, Inc. v. Poor*, 180 F.2d at 963; *In re Petition of Banker's Trust Co.*, 569 F.Supp. at 390. The uncontradicted testimony is that all repairs were necessary to put the NORTHERLY ISLAND in a condition which would meet Coast Guard and ABS seaworthiness standards. If any of these repairs were not due to the collision, they were pre-existing, and the pre-collision value of the dredge would have to be reduced accordingly. Any decrease in repair costs would be offset by an increase in the amount of pre-collision depreciation. The Court thus deducts $729,845 from the value of the dredge.

Subtracting this figure from $7,873,346, the Court FINDS that the value of the NORTHERLY ISLAND at the end of the voyage was $7,143,501.

The Court's inquiry is not done, however, as the claimants seek to include in the limitation fund as "pending freight" the value of NATCO's dredging contract, and the value of the M/V COLORADO RIVER under the "flotilla doctrine."

## II. PENDING FREIGHT

The Limitation of Liability Act limits the liability of a vessel-owner for damage caused by the vessel to "the amount or value of the interest of such owner in such vessel, *and her freight then vending.*" 46 U.S.C.App. § 183(a) (emphasis added). The statute provides that the pending freight refers to "freight for the voyage." 46 U.S.C.App. § 184.

The pending freight doctrine was explained in *The Main v. Williams,* 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894). In that case the Supreme Court stated that the real object of the limitation statute is "to limit the liability of vessel owners to their interest in the adventure." 152 U.S. at 131, 14 S.Ct. at 488. The Court held that the term "freight" denotes "not the thing carried, but the compensation for the carriage of it." *Id.* at 129, 14 S.Ct. at 487. The Court gave a broad reading to the term "freight," holding that it refers to "all rewards, hire, or compensation, paid for the use of ships. . . ." *Id.* As the Court observed:

> It would be creating a distinction without a real difference to say that a transatlantic steamer laden with passengers should be wholly exempt from the payment of freight, while another, solely engaged in the carriage of merchandise, should be obliged to pay the entire proceeds of her voyage.

*Id.* at 131, 14 S.Ct. at 488. In accordance with the statute, the "freight" which is included in the liability fund is the price paid for the entire voyage during which the casualty occurs. *Id.* at 129, 14 S.Ct. at 487. The Court finally stated that the doctrine should be broadly construed in favor of the injured party. *Id.* at 132–33, 14 S.Ct. at 488–89.

The issue in this case is whether the fruits of a dredging contract, for which the vessel was the main instrument of performance, and in which the vessel was engaged at the time of the casualty, should be included as "freight then pending." Generally a dredge, while engaged in dredging for a defined area, does not sail from port to port in the typical manner of a cargo vessel's voyage. What constitutes a cargo vessel's "freight then pending" in the traditional sense—the price of a contract of affreightment, or carriage of goods—is different than that of a hopper dredge. However, *The Main* stands for the proposition that the liability fund shall include the price payable for the use of the vessel during the pertinent voyage, no matter how the vessel is used.

The NORTHERLY ISLAND is a self-propelled ocean-going vessel which primarily dredges inlets and larger waterways. It has a cargo compartment known as a hopper, which holds the dredged material, or spoil, for haulage and disposal. It uses its hopper rather than a separate barge. During the course of a dredging contract it will make numerous trips to the open sea to dispose of dredged material. The NORTHERLY ISLAND sailed to North Carolina for the purposes of fulfilling North American's contract with the Army Corps of Engineers. While in North Carolina, the dredge had no other business, and remained on the dredging site except when dumping the spoil into the ocean.

The parties have cited two cases on the issue of whether the proceeds from a dredging contract should be added to the liability fund. Although these cases differ in result, their holdings are not incompatible.

In *The Carson,* 104 F.2d 762 (9th Cir. 1939), the dredge was performing a contract for deepening a channel in the middle of San Francisco Bay. The lower court was directed to add to the limitation fund the gross earnings of the dredge in the 20 days' duration of the dredging contract. In contrast, *In re Drill Barge No. 2 (Cross Contracting v. Law),* 454 F.2d 408 (5th Cir.1972), involved a barge engaged in the construction of a levee. The bargeowner performed the construction contract with land equipment as well as the floating dredge. The dredge was used to dig a canal, the dirt of which was used to build a levee. In that case, the court found little relationship between "pending freight" in the maritime sense and money due for construction of a levee. The court also found that there was no practical way to determine the amount of the contract attributable to the services of the dredge.

The dredge in *The Carson,* unlike the barge in *In re Drill Barge No. 2,* performed its contract in the middle of a bay, rather than adjacent to the land. Moreover, the entire contract was for dredging services performed on water, rather than in constructing a levee. In *In re Drill Barge*

*No. 2*, there was no practical way to determine that portion of the value of the contract which was attributable to the services of the dredge, as opposed to land-based equipment. 454 F.2d at 412.

Because of these distinctions, the Court finds the two cases compatible. The Court further finds the facts of *The Carson* to be consistent with the facts of this case, and accordingly holds that the value of NATCO's dredging contract with the Corps of Engineers—$588,000—should be included in the liability fund as freight pending for the voyage. In following *The Carson*, the Court is also mindful of the Supreme Court's admonition that limitation should be construed broadly in favor of the injured party. This increases the limitation fund to $7,731,501.

### III. FLOTILLA DOCTRINE

■ Under the flotilla doctrine, in some circumstances a tortfeasor must surrender the "combined means," or flotilla of vessels, by which it undertook completion of the maritime contract, in order to limit liability. The claimants in this case wish to invoke the flotilla doctrine in order to add to the limitation fund the value of the M/V COLORADO RIVER, a survey and support vessel which tended and assisted the NORTHERLY ISLAND in the enterprise. At the time of the accident the M/V COLORADO RIVER was not in attendance of the NORTHERLY ISLAND.

Whether to apply the flotilla doctrine depends on the legal relationship between the vessel owner and the injured party. *Complaint of Allied Towing Corp. (The Tug TESTER)*, 1978 AMC 2484, 2489 (E.D.Va. 1978) (Kellam, J.). If the damage was inflicted tortiously, the vessel owner must surrender only the value of the "offending" or "actively responsible" vessel. *Liverpool, Brazil and River Plate Steam Nav. Co. v. Brooklyn Eastern District Terminal*, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130 (1919). If, however, the vessel owner was engaged in the performance of a contract with the injured party at the time of the wrong, surrender of the combined means by which the owner undertook

performance of the contract is required. *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 332, 47 S.Ct. 368, 71 L.Ed. 663 (1927). Attending vessels necessary to the performance of the contract are included in the "flotilla." *Id.* at 329–30, 47 S.Ct. at 369–70; *In re Drill Barge No. 2, supra*, 454 F.2d at 412; *Petition of United States Dredging Corp.*, 264 F.2d 339, 341 (2d Cir. 1959). There has been no suggestion that the M/V COLORADO RIVER was not necessary to the performance of the dredging contract.

The United States, which through the Army Corps of Engineers was a party to the dredging contract with North American, may clearly invoke the flotilla doctrine. This does not necessarily follow for the other claimants. The fact that the tortfeasor was performing a contract with another party at the time of the wrong does not allow the injured party to invoke the doctrine. *Complaint of Allied Towing (Tug TESTER)*, 1978 AMC at 2490. However, Cape Hatteras Electric Membership Company and Carolina Telephone & Telegraph, each of which owns utility cables along the Bonner Bridge, and the State of North Carolina, which owns the bridge itself, contend that they were third-party beneficiaries to the dredging contract, and that as such they are entitled to surrender of the COLORADO RIVER, even though that boat was not an "offending" vessel. Neither proposition is a closed question.

The claimants base their argument on the following provision of the dredging contract:

> The Contractor shall protect from damage all existing improvements and utilities (1) at or near the work site and (2) on adjacent property of a third party, the locations of which are made known to or should be known by the Contractor. The Contractor shall repair any damage to those facilities, including those that are the property of a third party, resulting from failure to comply with the requirements of this contract or failure to exercise reasonable care in performing the work. If the Contractor fails or refuses

to repair the damage promptly, the Contracting Officer may have the necessary work performed and charge the cost to the Contractor.

Contract for Maintenance Dredging in Manteo (Shallowbag) Bay, North Carolina (Oregon Inlet Ocean Bar), ¶ 65(b).

This clause appears to be essentially a hold-harmless or indemnification clause in favor of the Corps of Engineers, and as such would not confer third-party beneficiary status on the claimants, at least under North Carolina law. *Dixie Container Corp. v. Dale*, 273 N.C. 624, 160 S.E.2d 708, 711 (1968). Moreover, the utilities and the State of North Carolina were not the usual creditor or donee beneficiaries of a contract. North American did not agree to satisfy a debt owed them by the Corps of Engineers, nor did it promise to perform any service for them as part of a bargained-for exchange with the Corps. However, the clause in question did impose two separate affirmative obligations on North American with respect to third parties, namely (1) to protect existing improvements and utilities from damage, and (2) to repair any damage to those facilities due to the fault of North American.

The first duty did not make the claimants third-party beneficiaries. That provision did no more than restate a duty of care already imposed on North American by maritime common law. Furthermore, Judge Kellam of this Court held in *Complaint of Allied Towing (Tug TESTER)*, *supra*, that similar contractual provisions did not create third-party beneficiary status. In that case, Allied Towing contracted with Virginia Electric Power Company (VEPCO) to carry fuel to VEPCO's power station from a refinery owned by American Oil Company (Amoco). Allied Towing provided a barge and two tugs to the enterprise. The barge collided with Amoco's dock, damaging the dock. Amoco sought to invoke the flotilla doctrine and require surrender of all three vessels. The contract required Allied Towing to supply barges compatible with Amoco's dock, to keep Amoco informed of all aspects of the transportation of the fuel, and to comply with Amoco's regulations regarding use of the dock. Judge Kellam held that these contractual obligations did not confer any benefit on Amoco which would make Amoco a third-party beneficiary to the contract. *Complaint of Allied Towing (Tug TESTER)*, 1978 AMC at 2492. Accordingly, this Court holds that the contractual duty to protect improvements and utilities from damage did not confer third-party beneficiary status on any of the claimants.

The second duty imposed by the dredging contract required North American to repair any damage it caused to utilities or improvements during performance of its dredging contract. The Court assumes, *arguendo*, that the claimants might independently enforce this duty to repair any damage incurred as a result of North American's fault, and that they were third-party beneficiaries to that extent.

In *Tug TESTER*, in holding that Amoco was not a third-party beneficiary, Judge Kellam avoided the question whether a third-party beneficiary may invoke the flotilla doctrine. The Court has found no case, and the parties have cited none, which answers this question. Indeed, the only cases that have applied the flotilla doctrine have involved a contract between the vessel-owner and the injured party, or a master-servant relationship. *Complaint of Allied Towing (Tug TESTER)*, 1978 AMC at 2491, and cases cited therein. Neither exists in this case. On the limited facts of this case, the Court holds that the claimants, who at most are only *contingent* third-party beneficiaries, may not invoke the flotilla doctrine to require surrender of the value of the COLORADO RIVER.

As discussed above, the flotilla doctrine was explained in *Sacramento Navigation Co. v. Salz*. The Supreme Court, in distinguishing that case from the facts in the *Liverpool* case, observed that the injury in *Liverpool* was in no way related to the flotilla. The injury was tortious, and did not breach any contractual obligation. *Sacramento Nav. Co. v. Salz*, 273 U.S. at 332, 47 S.Ct. at 370. In the words of Judge Learned Hand, when the injury involves a "base invasion of interests" rather than

some "preceding consensual relation with the injured party," the flotilla doctrine does not apply. *Petition of United States Dredging Corporation,* 264 F.2d at 340. The vessel owner must be engaged in a contract with the injured party *at the time of the wrong. Complaint of Allied Towing (Tug TESTER),* 1978 AMC at 2489.

At the time of the collision with the Bonner Bridge, North American had no contractual relationship with the State of North Carolina, Cape Hatteras or Carolina Telephone & Telegraph. If properly performed, with no fault on North American, the contract conferred no benefit on these claimants, and no duties flowed between them. Rather, the contract only required North American to make whole any party whom it wrongly injured in performing the contract. This duty to repair did not arise until *after* the collision with the Bonner Bridge, and only if North American's fault is established. The claimants' status as third-party beneficiaries therefore could not possibly arise until after the casualty. Thus their claimed status as third-party beneficiaries was at the least contingent on the occurrence of certain events. The claimants could receive no benefit unless a disaster occurred, and even then they could seek only repair of damages, and not compensation for consequential losses.

Accordingly, there was no contractual relationship between the claimants and North American at the time of the casualty. Furthermore, that relationship had nothing to do with the COLORADO RIVER. Because the injury itself was purely tortious, not involving the contractual relationship, the claimants (other than the United States) may not invoke the flotilla doctrine.

However, because the United States may invoke the flotilla doctrine, the value of the M/V COLORADO RIVER, which according to the testimony of Mr. Ottaway is $155,461, *see Exhibit 36,* shall be added to the limitation fund, increasing the fund to $7,886,962. However, the United States shall share proportionately in the fund consisting of the value of the NORTHERLY ISLAND and its pending freight. If that fund is insufficient to satisfy the claim of the United States in full, the United States may look to that portion of the fund consisting of the value of the M/V COLORADO RIVER.

## IV. CONCLUSION

The value of the NORTHERLY ISLAND is set at $7,143,501. The value of the pending freight is $588,000. The value of the M/V COLORADO RIVER is $155,461. The total is $7,886,962.

The value of the NORTHERLY ISLAND and her pending freight, together with interest thereon, will be available for all claims, to be apportioned pursuant to 46 U.S.C.App. § 184. If such apportionment does not satisfy the claim of the United States, the value of the M/V COLORADO RIVER, together with interest thereon, will be available for the claim of the United States.

Supplemental Admiralty Rule F(1) provides that if plaintiffs give security, security shall also be given for interest at the rate of 6 percent per annum from the date of the security.

Plaintiffs shall post bond in the amount of $7,886,962, together with interest at the rate of 6 percent per annum from November 1, 1990, the date of filing, with surety according to the rules of this Court.

IT IS SO ORDERED.

## APPENDIX
### SUMMARY OF VALUATION OF THE NORTHERLY ISLAND

| | |
|---|---|
| 1983 construction cost: | $ 9,364,648 |
| 1990 reconstruction cost: | $10,864,454 |
| 1990 reconstruction cost, depreciated: (5% reducing balance, 7 years) | $ 7,587,053 |
| Electronic capital additions, depreciated (Table 1): | $ 64,147 |
| Non-electronic capital additions, depreciated (Table 2): | $ 222,146 |
| Reproduction cost, depreciated: | $7,873,346 |

Cost of repairs: ($ 729,845)
VALUE OF THE NORTHERLY ISLAND: $7,143,051
Value of the pending freight: $ 588,000
Value of the M/V COLORADO RIVER: $ 155,461
TOTAL LIABILITY $ 7,886,962

### Table 1: DEPRECIATION OF CAPITAL ADDITIONS (ELECTRONICS)

1. Hewlett–Packard positioning equipment

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1984 | $17,051 | 6 years | $ 4,470 |

2. Delnorte positioning equipment

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1985 | $43,092 | 5 years | $14,120 |

3. Communication & Navigation equipment

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1989 | $56,946 | 1 year | $45,557 |

TOTAL DEPRECIATED VALUE = $64,147

### TABLE 2: DEPRECIATION OF CAPITAL ADDITIONS (NON–ELECTRONIC)

1. Design/install degassing chamber

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1985 | $17,753 | 5 years | $ 13,737 |

2. Install Sugar Island Crane on Bow

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1988 | $ 6,687 | 2 years | $ 6,035 |

Subtotal: $ 19,772

3. Modification of lower leg supports

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1985 | $ 7,945 | 5 years | $ 6,148 |

4. Purchase/install larger radiators

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1985 | $ 31,894 | 5 years | $ 24,679 |

5. MOD 1350 Z

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1986 | $ 23,300 | 4 years | $ 18,978 |

6. Exch. (3) Stern Drive unit

| Year | Original Value | Depreciation Period | Depreciated Value |
|---|---|---|---|
| 1986 | $349,354 | 4 years | $284,551 |

7. Exch 3 Stern DR units w/Ulstein

| Year | Original Value | Depreciation Period | Depreciated Value |
|------|---------------|---------------------|-------------------|
| 1987 | $ 3,422 | 3 years | $ 2,934 |
| | | | $337,290 |
| | | | × 60% |

Subtotal: $202,374

TOTAL DEPRECIATED VALUE = $19,772 + $202,374 = $222,146